IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MARSHALL VAN REED, (AIS #167850), :

      Plaintiff,                  :

vs.                            :     CIVIL ACTION 08-0420-CG-C

DR. ROBERT BARNES, et al.,     :

      Defendants.           :

REPORT AND RECOMMENDATION

Plaintiff, an Alabama prison inmate proceeding pro se and in forma pauperis filed a Complaint under 42 U.S.C. § 1983.  This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the Court on Defendants' Motion for Summary Judgment (Docs. 15, 17), and Plaintiff's opposition thereto.  (Doc. 20).  For the reasons stated below, it is recommended that Defendants' Motion for Summary Judgment be granted and that Plaintiff's action against these Defendants be dismissed with prejudice.

I.  SUMMARY OF ALLEGATIONS

1. From its review of the record, the Court summarizes the parties' allegations which are material to the issues addressed in this Report and Recommendation.

2. On May 25, 2008, Plaintiff noticed a small knot on his right ear, and signed up for sick call so that his ear could be examined by the medical staff at Holman Correctional Facility ("Holman"), where Plaintiff is currently incarcerated, serving a

sentence of life without the possibility of parole for the crimes of Rape, Robbery and Burglary.  (Doc. 1 at 6, Complaint;  Doc. 20 at 1, Affidavit of Plaintiff).

3. The following day, on May 26, 2008, Plaintiff was examined by a nurse who referred Plaintiff to be seen by Dr. Barnes.  (Doc. 20 at 2).  On May 27, 2008, Dr. Barnes examined the small knot on Plaintiff's right ear, and determined the knot to be a small cyst filled with fluid.  (Id.).

4. Using local anesthesia, Dr. Barnes performed an incision and drained the fluid from the cyst.  (Doc. 17, Ex. A at 3, Affidavit of Robert J. Barnes, M.D.).  Dr. Barnes then cleaned and dressed the wound.  (Id.).  Plaintiff claims that Dr. Barnes refused to prescribe pain medication, or an antibiotic at this time.  (Doc. 1 at 8).

5. On June 2, 2008, Plaintiff returned to Dr. Barnes for a follow-up visit, and Dr. Barnes again drained fluid from the cyst on Plaintiff's right ear.  (Doc. 1 at 8; Doc. 17, Ex. A at 3).  After cleaning and dressing the wound, Dr. Barnes prescribed Bactrim, an antibiotic, as well as pain medication for Plaintiff.  (Id.).

6. Plaintiff claims that he continued to suffer from pain and swelling of his right ear, and thus returned to Dr. Barnes on June 9, 2008.  (Doc. 1 at 9).  At this time, Plaintiff claims that his ear "had swellen (sic) up by the size of a half a golf ball."  (Id.).  Dr. Barnes again drained the cyst and cleaned and dressed Plaintiff's wound.  (Doc. 17, Ex. A at 3).

7. On June 10, 2008, Plaintiff went to the Correctional Medical Services Health Care Unit for treatment for his right ear.  (Doc. 1 at 9).  At this time, Plaintiff alleges that

Dr. Barnes and the nurses agreed that the swelling of Plaintiff's ear had worsened and that he should be treated by a specialist.  (Id.).  Plaintiff claims that Dr. Barnes ordered that Plaintiff "be seen and treated by an outside ear specialist within the following two or three days."  (Id.).

8. On June 11, 2008, Dr. Barnes wrote an order for an ENT consult for Plaintiff, "due to the reoccurrence of drainage."  (Doc. 17, Ex. A at 4, Medical Records at 84).

9. On June 13, 2008, Plaintiff again went to the Correctional Medical Services Health Unit "voluntarily" for treatment because, according to Plaintiff, his right ear had become larger and was causing him a great amount of pain.  (Doc. 1 at 9).  Plaintiff was particularly unhappy because he believed that he should have been seeing an ear specialist, instead of Dr. Barnes, on this day.  (Id. at 9-10).

10. Dr. Barnes drained Plaintiff's cyst a fourth time, again cleaning and dressing the area.  (Id.; Doc. 17, Ex. A at 4).  Plaintiff contends that he was given no medication for infection or pain on this occasion.  (Doc. 1 at 10).

11. Plaintiff somewhat vaguely claims that on the days of June 21, 22, and 23, 2008, he was not given his "daily treatment" for his right ear as the result of intentional conduct by unidentified nurses. (Doc. 1 at 16).

12. Dr. Barnes examined Plaintiff on July 11, 2008, and noted that the cyst had decreased in size.  (Doc. 17, Ex. A at 4).  Dr. Barnes prescribed the pain medication Lortab to Plaintiff for three days.  (Id.  at 4 and 73).

13. On July 31, 2008, Plaintiff was examined by an outside ENT specialist, Dr.

3

Rick Love, in Montgomery.  (Doc. 17, Ex. A at 4, 82-83).  According to the medical

records, Dr. Love determined that Plaintiff suffered from Chondritis, which is

inflammation of cartilage.  (Id.).  Dr. Love noted, however, that Plaintiff's condition

appeared acceptable and stable, and that Plaintiff could, if necessary, return for a follow-

up in one to two months.  (Id.).

14. On August 27, 2008, Dr. Barnes examined Plaintiff and found the cyst to be

well healed with no fluid.  (Doc. 17, Ex. A at 4).  Dr. Barnes did treat Plaintiff with the

pain reliever Percogesic for the back pain which he was complaining of on that date.

(Id.).

15.  Additionally, Dr. Barnes found Plaintiff's ear to be well healed on October 7,

2008, and on November 11, 2008.  (Id. at 4-5).  It is Dr. Barnes' judgment that Plaintiff's

ear has "completely healed with no residual swelling."  (Id. at 5).

## II.  PROCEDURAL ASPECTS OF THE CASE

1. On July 17, 2008, Plaintiff filed the present § 1983 action against Defendants

Robert Barnes, M.D., and Correctional Medical Services, Inc. ("CMS") alleging denial of

proper medical treatment for his right ear problem.  (Doc. 1 at 8-17).

2. Plaintiff claims that his medical treatment was inadequate, causing him "pain

and suffering," for which he seeks injunctive relief, as well as compensatory, and punitive

damages.[1]  (Id. at 8-18; Doc. 20).

---

[1] Regarding Plaintiff's claim for injunctive relief, he has requested that this Court
order Defendants to send him to a "Free World Ear Specialist As Soon As Possible."
(Doc. 1 at 18).  However, this request for relief is moot as Plaintiff was seen by a "free

3. In their Answer and Special Report filed on December 4, 2008, Defendants deny Plaintiff's allegations and assert numerous defenses including absolute and qualified immunity.[2]   (Docs. 15, 17).

4. On December 15, 2008, the Court ordered that Defendants' Special Report and Answer be treated as a Motion for Summary Judgment.  (Doc. 19).  Defendants' motion and Plaintiff's response in opposition thereto are now before the Court.

### III.  SUMMARY JUDGMENT STANDARD

1. In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles.  The Federal Rules of Civil Procedure grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment.  "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

world" ENT, Dr. Rick Love, in Montgomery, on July 31, 2008.  (Doc. 17, Ex. A at 80, Medical Records).  Further, it appears from the record that Plaintiff's ear condition has been resolved.  Therefore, Plaintiff's claim for injunctive relief is moot.

[2] Although Defendants have asserted the affirmative defenses of qualified and absolute immunity, as private entities, Defendants are not entitled to either immunity defense.  See Swann v. Southern Health Partners, Inc., 388 F.3d 834, 837 (11th Cir. 2004) ("The parties agree that as a private entity, SHP [a private corporation employed by the County to provide medical care to inmates at the county jail] is not entitled to assert a qualified immunity defense."); Hinson v. Edmond, 205 F.3d 1264, 1265 (11th Cir. 2000) (a "privately employed prison physician" "is ineligible to advance the defense of qualified immunity"); Edwards v. Alabama Dep't of Corrections, 81 F. Supp. 2d 1242, 1254 (M.D. Ala. 2000) (a private entity contracting with a state to provide medical services to state inmates "is not entitled to qualified immunity...").  With respect to absolute immunity, Defendants have cited no case, and the Court is aware of no case, extending absolute immunity to privately employed physicians providing medical services to state inmates.

show that there is no genuine issue as to any material fact. . . .'"  Celotex Corp. v. Catrett,

477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c).

     2. The Court must view the evidence produced by "the nonmoving party, and all

factual inferences arising from it, in the light most favorable to" that party.  Barfield v.

Brierton, 883 F.2d 923, 934 (11th Cir. 1989).

     3. However, Rule 56(e) states that:

> an adverse party [to a motion for summary judgment] may not
> rest upon the mere allegations or denials of the adverse
> party's pleading, but the adverse party's response, by
> affidavits or as otherwise provided in this rule, must set forth
> specific facts showing that there is a genuine issue for trial.  If
> the adverse party does not so respond, summary judgment, if
> appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e); see also Celotex Corp., 477 U.S. at 325-27.

     4. "[T]here is no issue for trial unless there is sufficient evidence favoring the

nonmoving party for a jury to return a verdict for that party. . . .  If the evidence is merely

colorable, . . . or is not significantly probative, . . . summary judgment may be granted."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (internal citations

omitted).  "Summary judgment is mandated where a party 'fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial.'"  Custom Mfg. & Eng'g, Inc. v.

Midway Servs., Inc., 508 F.3d 641, 647 (11th Cir. 2007) (citations omitted).

## IV.  DISCUSSION

1. As discussed above, Plaintiff seeks redress in this action pursuant to 42 U.S.C. § 1983 for an alleged constitutional deprivation arising out of his medical treatment from May 27, 2008, til the filing of this Complaint on July 17, 2008, while he was incarcerated at Holman Correctional Facility.  (Docs. 1, 20).

2. Plaintiff claims that Defendants provided unconstitutionally inadequate medical treatment for him beginning on May 27, 2008, when Dr. Barnes first examined the small cyst on his right ear.  (Docs. 1, 20).

3. Section 1983 provides in pertinent part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983 (1994).

4. In addressing Plaintiff's claims brought under § 1983, the Court begins its analysis "by identifying the specific constitutional right allegedly infringed. . . ." Graham v. Connor, 490 U.S. 386, 394 (1989).

5. The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.

6. "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious

medical needs." Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing Estelle

v. Gamble, 429 U.S. 97, 104 (1976)).

7. In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit

delineated the objective and subjective portions of an Eighth Amendment claim as

follows:

> An Eighth Amendment claim is said to have two components,
> an objective component, which inquires whether the alleged
> wrongdoing was objectively harmful enough to establish a
> constitutional violation, and a subjective component, which
> inquires whether the officials acted with a sufficiently
> culpable state of mind.

Sims, 25 F.3d at 983.

8. To meet the objective element required to demonstrate a denial of medical care

in violation of the Eighth Amendment, a plaintiff first must demonstrate the objective

existence of a "serious" medical need. Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d

1176, 1186 (1994) (citing Hudson v. McMillian, 503 U.S. 1, 10 (1992)). "[A] 'serious'

medical need is one that has been diagnosed by a physician as mandating treatment or one

that is so obvious that even a lay person would easily recognize the necessity for a

doctor's attention." Hill, 40 F.3d at 1187 (citations omitted). "[T]he medical need must

be 'one that, if left unattended, pos[es] a substantial risk of serious harm.'" Farrow v.

West, 320 F.3d 1235, 1243 (11th Cir. 2003) (quotation marks and citations omitted).

9. Next, in order to meet the required subjective element of an Eighth Amendment

denial of medical care claim, a plaintiff must demonstrate "deliberate indifference" to a

serious medical need.  Hill, 40 F.3d at 1186.

> In Estelle, the Supreme Court established that "deliberate
> indifference" entails more than mere negligence.  Estelle, 429
> U.S. at 106, 97 S. Ct. 285; Farmer, 511 U.S. at 835, 114 S. Ct.
> 1970.  The Supreme Court clarified the "deliberate
> indifference" standard in Farmer by holding that a prison
> official cannot be found deliberately indifferent under the
> Eighth Amendment "unless the official *knows of* and
> *disregards an excessive risk to inmate health or safety;* the
> official must both be aware of facts from which the inference
> could be drawn that a substantial risk of serious harm exists,
> and he must also draw the inference."  Farmer, 511 U.S. at
> 837, 114 S. Ct. 1970 (emphasis added).  In interpreting
> Farmer and Estelle, this Court explained in McElligott that
> "deliberate indifference has three components: (1) subjective
> knowledge of a risk of serious harm; (2) disregard of that risk;
> (3) by conduct that is more than mere negligence."
> McElligott, 182 F.3d at 1255; Taylor, 221 F.3d at 1258
> (stating that defendant must have subjective awareness of an
> "objectively serious need" and that his response must
> constitute "an objectively insufficient response to that need").

Farrow, 320 F.3d at 1245-46 (emphasis in original).

10.  "Delay in access to medical attention can violate the Eighth Amendment . . .

when it is tantamount to unnecessary and wanton infliction of pain."  Hill, 40 F.3d at

1187 (internal citations and quotation marks omitted).  "Cases stating a constitutional

claim for immediate or emergency medical attention have concerned medical needs that

are obvious even to a layperson because they involve life-threatening conditions or

situations where it is apparent that delay would detrimentally exacerbate the medical

problem."  Id.; accord Lancaster, 116 F.3d at 1425 (applying the Fourteenth Amendment).

11. "The tolerable length of delay in providing medical attention depends on the

*nature* of the medical need and the *reason* for the delay." Hill, 40 F.3d at 1188 (emphasis

in original) (quoting Harris v. Coweta County, 21 F.3d 388, 393-94 (11th Cir. 1994)).

> 12.    The "seriousness" of an inmate's medical needs also may be
> decided by reference to the *effect* of delay in treatment.
> Gaudreault, 923 F.2d at 208; Monmouth County, 834 F.2d at
> 347.  Where the delay results in an inmate's suffering "a life-
> long handicap or permanent loss, the medical need is
> considered serious." Id.

Hill, 40 F.3d at 1188 (emphasis in original).

13. "An inmate who complains that delay in medical treatment rose to a

constitutional violation must place **verifying medical evidence** in the record to establish

the detrimental effect of delay in medical treatment to succeed." Id. (emphasis added)

(footnotes omitted).

14. The Court assumes, for purposes of this motion, that Plaintiff's right ear

problem constituted an objectively serious medical injury.  Therefore, the Court turns to

the second, subjective element of Plaintiff's claim, that is, whether Defendants were

deliberately indifferent to Plaintiff's serious medical need.

15. Plaintiff claims that his right ear is "damaged for life" as a result of Dr. Barnes'

"neglect and improper medical procedure, in violation of the Plaintiff's fourteen (sic) and

eighth constitutional amendment rights."  (Doc. 20 at 6).

16. In his Complaint,  Plaintiff asserts that he first saw Dr. Barnes on May 27,

2008, when Plaintiff was suffering from a small knot on his right ear.  At this time,

according to Plaintiff, Dr. Barnes cut the knot to get a blood sample in order to determine

the cause of the illness.  (Doc. 1 at 8).  No medication was prescribed for pain or infection at this time, despite Plaintiff's request.  (Id.).

17. On June 2, 2008, Plaintiff saw Dr. Barnes for a follow-up visit.  (Doc. 17, Ex. A at 3).  The record reflects that the cyst on Plaintiff's ear was again swollen, and again Dr. Barnes cut the cyst, draining the fluid.  (Doc. 1 at 8; Doc. 17, Ex. A at 3).  A prescription for the antibiotic Bactrim and the pain reliever Tylenol #3 was given to Plaintiff.  (Doc. 1 at 8-9).

18. One week later, on June 9, 2008, Dr. Barnes again drained the cyst on Plaintiff's right ear, which, according to Plaintiff, had become rather large.  (Doc. 1 at 9).  The following day Plaintiff requested to see a specialist, and Dr. Barnes agreed.  (Id.).

19.  On June 11, 2008, as a result of the reoccurrence of drainage of the cyst, Dr. Barnes wrote an order for an ENT consult for Plaintiff.  (Doc. 17, Ex. A at 4 and 83). The request was authorized by Correctional Medical Services on June 17, 2008, and on the authorization form it was noted that an appointment had been made for Plaintiff for "August 5, 2008 at 11:00 a.m." with Dr. Rick Love in Montgomery, Alabama.  (Id. at 83).

20. On June 13, 2008, Plaintiff was again suffering with his right ear, and was examined again by Dr. Barnes.  (Doc. 1 at 9).  Dr. Barnes again cut and drained the cyst, also cleaning and dressing the wound.  (Id. at 9-10; Doc. 17, Ex. A at 4).  Plaintiff was particularly upset that Dr. Barnes was treating him on this date because he believed that he should have been treated by an outside specialist by this point.  Specifically, Plaintiff states in his Complaint that "instead of Defendant Barnes honored (sic) his word, he,

11

Defendant Barnes decided that he would exercise the outside ear specialist role, and thus he, Defendant Barnes cut the Plaintiff's right ear open again, for the fourth (4th) time." (Doc. 1 at 10).

21. The record reflects that Dr. Barnes next saw Plaintiff on July 11, 2008, and noted that the cyst had decreased in size.  Dr. Barnes gave Plaintiff a prescription for the pain medication Lortab for three days.  (Doc. 17, Ex. A at 4).

22. Plaintiff then saw the ENT specialist Dr. Rick Love, in Montgomery, on July 31, 2008, earlier than originally scheduled by CMS.  (Id.).  According to Dr. Love's records, Plaintiff suffered from Chondritis, which is inflammation of cartilage.  (Id. at 4, 80-81).  Dr. Love noted that Plaintiff's ear was recently drained, and that it looked stable. (Id.).  Dr. Love advised that Plaintiff's condition was stable and acceptable, and that Plaintiff could return if needed in one or two months.  (Id.).

23. Approximately one month later, on August 27, 2008, the record reflects that Dr. Barnes examined Plaintiff, and that the cyst appeared well healed with no fluid.  At that time, Plaintiff was complaining of back pain, and Dr. Barnes prescribed the pain reliever Percogesic for Plaintiff's complaint.  (Doc. 17, Ex. A at 4).

24. Dr. Barnes saw Plaintiff again on October 7, 2008, and again noted that Plaintiff's ear appeared well healed.  (Id.).

25. On November 11, 2008, Dr. Barnes examined Plaintiff and noted that Plaintiff's ear appeared completely healed with no residual swelling.  (Id. at 5).

26. In this action, Plaintiff complains extensively of the "negligent" and "unprofessional" conduct of Dr. Barnes which, according to Plaintiff, has contributed to his injuries.  Specifically, Plaintiff complains that

> [i]t is a great possibility to believe that if Defendant Barnes would have performed adequate medical services and provided the proper type of treatment during his first cutting on the Plaintiff's right ear, and then prescribed the Plaintiff with both medication for pain and also medication for the infection, the Plaintiff's right ear would not have become infected and then swelled to even greater proportions and thus causing the Plaintiff even greater pain and suffering.

(Doc. 1 at 14).

27. Plaintiff claims that Dr. Barnes has shown "both a callous disregard for the Plaintiff's well-being, by ignoring the proper standards, when it comes to cutting on a person's body part..."  (Doc. 1 at 17).  It is on this basis that Plaintiff claims that Dr. Barnes was "deliberately indifferent" to his serious medical need.[3]  The Court disagrees.

_____

[3]Plaintiff also claims Defendant CMS has had a "corrupt role" in this matter, alleging its nursing staff is well aware of Dr. Barnes' inadequate medical procedures. (Doc. 1 at 14). This Court has determined that Dr. Barnes was not deliberately indifferent to Plaintiff. However, even if Dr. Barnes had been deliberately indifferent to Plaintiff's serious medical needs, Plaintiff's cause of action against CMS would fail.  Plaintiff has shown no causal connection between his injury and the alleged role of CMS.  See Edwards v. Alabama Dep't of Corrs., 81 F. Supp. 2d 1242, 1255 (M.D. Ala. 2000) ("In order to prove that CMS should be liable, the plaintiffs would have to demonstrate that CMS itself directly caused the violation of their constitutional rights through their adoption of some official policy or practice. . . . A theory of respondeat superior is not sufficient to support their § 1983 claim. . . .") (citations omitted).  See also Pinkney v. Davis, 952 F. Supp. 1561, 1569 (M.D. Ala. 1997) ("[P]laintiff must show that the physicians and medical personnel, in providing constitutionally inadequate treatment to the plaintiff, were implementing official [company] policy or unofficial customary practice.").

28. In order to constitute "deliberate indifference," Defendants must have known of and disregarded an excessive risk to Plaintiff's health.  Farrow, 320 F.3d at 1245.

29. The record is devoid of any evidence that Defendants had subjective knowledge of, and disregarded, a risk of serious harm to Plaintiff from his right ear condition.  To the contrary, the record shows that Dr. Barnes regularly treated Plaintiff for his ear problem from the time that it began on May 27, 2008, until Dr. Barnes determined that it had completely healed on November 11, 2008.  (Doc. 17, Ex. A).  During that time, not only did Dr. Barnes treat and prescribe medications for Plaintiff's right ear condition, but he also ensured that Plaintiff was examined by a free world ENT specialist, and continued to see Plaintiff for his other ailments as well, i.e. back pain on August 27, 2008. (Doc. 17, Ex. A at 4).

30. A review of Plaintiff's medical records submitted to this Court reveals quite extensive medical care by Dr. Barnes and CMS.  Although it might not have been the specific medical care that Plaintiff wanted, there is certainly no evidence that Dr. Barnes or CMS was deliberately indifferent to Plaintiff, or that they ever stopped treating Plaintiff's illness or stopped trying to improve his condition.

---

In addition, "plaintiff must show that the policy or custom was the 'moving force [behind] the constitutional violation.'"  Pinkney, 952 F. Supp. at 1569 (citations omitted). "[I]t is clear that not only must there be some degree of 'fault' on the part of [the company] in establishing the policy or tolerating the custom, but there must be a causal link between the custom or policy and the constitutional deprivation."  Id. (citations omitted).

31.    "When a prison inmate has received medical care, courts
hesitate to find an Eighth Amendment violation." <u>Waldrop v.
Evans</u>, 871 F.2d 1030, 1035 (11th Cir. 1989). "[D]elay in
medical treatment must be interpreted in the context of the
seriousness of the medical need, deciding whether the delay
worsened the medical condition, and considering the reason
for delay."<u>Hill</u>, 40 F.3d at 1189.

<u>Martin v. Barnes</u>, 2008 WL 250603, *8 (S.D. Ala. 2008).

32. Further, Plaintiff has submitted no"verifying medical evidence" showing that

any delay in treatment by the EMT specialist worsened or exacerbated his medical

condition.[4]  <u>Hill</u>, 40 F.3d at 1188 (emphasis added).

33.    It is a reality of prison life that appointments with physicians
or for diagnostic testing for treatment of non-life-threatening
medical conditions must be scheduled.  It is particularly
complicated when an inmate is to be seen by an offsite
physician.  In such instances, appointments must be made;
transportation must be arranged; security must be provided to
escort the inmate to the appointment and back; and priority
must be given to inmates according to the nature of their
medical problems.  (Doc. 17, art. 11 at 4).  It is reasonable to
expect some delay while arrangements are being made.
Patients in the free world often experience similar delays
when seeking treatment of non-life-threatening injuries or
ailments.

<u>Martin</u>, 2008 WL 250603 at *8.

34. Considering all of the circumstances surrounding the treatment that

Plaintiff received for his ear problem, including the short time in which it took

---

[4]The Court further notes that when Plaintiff was examined by the EMT, Dr. Love
did nothing to Plaintiff's ear, noting that it was stable and acceptable.  (Doc. 17, Ex. A at
80-81).

Defendants to secure an appointment with the outside specialist, the Court cannot at all say that the Defendants were deliberately indifferent to Plaintiff's medical problem. Thus, Plaintiff has failed to establish the subjective element of his denial of medical care claim.

35. If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial," Rule 56(c) mandates that summary judgment be entered against the nonmovant. Celotex Corp., 477 U.S. at 322.

36. "No material issues can be in dispute where the plaintiff's evidence fails to establish a constitutional violation." Bennett v. Parker, 898 F.2d 1530, 1534 (11th Cir. 1990). Therefore, since no constitutional violation has been established, Defendants' Motion for Summary Judgment is due to be granted.


V.  CONCLUSION

Based on the foregoing, the Court concludes that Defendants are entitled to summary judgment in their favor on all claims asserted against them by Plaintiff.

Accordingly, it is recommended that the Motion for Summary Judgment of Defendants Robert Barnes, M.D., and Correctional Medical Services, Inc., be GRANTED and that the entirety of Plaintiff's Complaint against these Defendants be DISMISSED with prejudice.

16

The instructions which follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

DONE this 3rd day of March, 2009.

 s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

## MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
## AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
## <u>AND FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>

1.      **Objection**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge. <u>See</u> 28 U.S.C. § 636(b)(1)(C); <u>Lewis v. Smith</u>, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      **Opposing party's response to the objection.**  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection.  Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.      **Transcript (applicable where proceedings tape recorded)**.  Pursuant to 28 U.S.C. § 1915 and Fed. R. Civ. P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.